IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 23, 2024 Session

**STATE OF TENNESSEE v. JOSHUA ADAM HILL**

**Appeal from the Criminal Court for Carter County**
**No. 25220      Lisa Nidiffer Rice, Judge**

_____

**No. E2023-00018-CCA-R3-CD**

_____

Following a trial, a jury convicted Defendant, Joshua Adam Hill, on two counts of aggravated rape, one count of incest, and one count of sexual battery by an authority figure, for which he was sentenced to an effective twenty-five years' incarceration. On appeal, Defendant contends that the evidence at trial was insufficient to support his convictions for aggravated rape and sexual battery by an authority figure and that the trial court committed plain error when it instructed the jury on the elements of those offenses. Following a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and J. ROSS DYER, JJ., joined.

Joseph O. McAfee (on appeal), Greeneville, Tennessee; and Donald Spurrell (at trial) and Grace Studer (at trial), Johnson City, Tennessee, for the appellant, Joshua Adam Hill.

Jonathan Skrmetti, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Steven R. Finney, District Attorney General; and Matthew Roark and Timothy Horne, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual and Procedural Background**

In May 2019, the Carter County Grand Jury issued a presentment charging Defendant with aggravated rape in Counts 1 and 2, incest in Count 3, and sexual battery by an authority figure in Count 4. The case proceeded to trial in November 2021.

Destiny Bowers testified that the victim[1] was her half-sister and that, in March 2019, they were living at a property on Whitehead Hollow Road in Carter County with their mother, Defendant, Defendant's girlfriend, and two other of Ms. Bowers' sisters. Ms. Bowers stated that she and her mother and sisters had moved to the location so that the victim could be closer to Defendant, who was the victim's biological father. Ms. Bowers explained that the victim had not seen Defendant in a long time and that they had been "trying to have [the victim] reconnect with her father[.]"

Ms. Bowers testified that, on the night of March 31, 2019, she was playing a video game with Defendant in the camper on the property, where Defendant and Defendant's girlfriend, Jillian Janson, stayed. She said that Defendant and Ms. Janson got into a fight around 2:00 a.m., and Ms. Janson initially left the camper to sleep in her car. Ms. Bowers stated that Defendant convinced Ms. Janson to return to the camper, where Ms. Janson fell asleep on a bunk bed behind Ms. Bowers. Ms. Bowers explained that the victim fell asleep "in the middle bed where [Defendant's] computer [was]." She said that, around 3:00 a.m., Defendant took the victim to a bedroom in the camper, where Defendant turned on anime cartoons. She said that Defendant "had a hand around [the victim] leading her to the room." Ms. Bowers testified that, although the cartoons were "louder than usual[,]" she was not suspicious of what was occurring inside the bedroom. She said that Defendant was in the bedroom with the victim for about an hour, and then he came back out, sat down at the computer, and continued playing the video game with Ms. Bowers.

Ms. Bowers recalled that, the following morning, the victim would not get up to go to school. She said that the victim "seemed off" and was "upset and just didn't want to go to school." Ms. Bowers testified that the victim, who was allergic to bees, was stung by a bee a few days prior. She said that the victim did not go into anaphylactic shock or require a shot from an epinephrine pen. Instead, Defendant gave the victim Benadryl so that "hopefully [the victim] could sleep and the swelling [would go] down." Ms. Bowers stated that, after her other sister left for school around 6:00 a.m., the victim went to a trailer beside the camper to sleep. Ms. Bowers also went to the trailer to sleep. She said that, a few minutes before 3:00 p.m., the victim woke her up and told her that "something bad . . . happened to her" and that Defendant "did something to her." Ms. Bowers said that she asked the victim what happened because the victim was crying, and she "could tell something was wrong" with the victim. Ms. Bowers testified that the victim told her what had happened. Ms. Bowers then "relayed that to [her] mother who was within minutes of arriving home[.]" Ms. Bowers said that their mother immediately took the victim to the hospital for an examination. Ms. Bowers denied that she and her sisters ever shared underwear.

---

[1] It is the policy of this court to protect the identity of minor victims of sexual assault.

Asia Lovette testified that she had four daughters but that Defendant was the father of only one of her daughters— the victim. Ms. Lovette explained that she began dating Defendant in 2005 and that, about a month after they moved in together, she became pregnant with the victim. Ms. Lovette testified that she and Defendant had broken up three months after the victim's birth and that the victim had no contact with Defendant until the victim was twelve years old. She explained that, when the victim was twelve, the victim contacted Defendant through Facebook. Ms. Lovette said that, "from there[,] they started a relationship trying to get to know each other."

Ms. Lovette stated that, before April 1, 2019, the victim had been "very outgoing" and athletic and that the victim had "loved life." Ms. Lovette said that the victim was "happy" and "proud" that she was getting to know Defendant. She said that, eventually, the victim began spending the night with Defendant and Ms. Janson at their camper. The victim told Ms. Lovette that Defendant was working as a nurse at an assisted living home, and Ms. Lovette believed that Defendant was a "positive influence" in the victim's life.

Ms. Lovette testified that, several months before the incident, she and her daughters moved into a trailer located on the same property as Defendant's camper. Ms. Lovette explained that the trailer previously belonged to Defendant's mother and that it sat about ten feet away from Defendant's camper. Ms. Lovette said that Defendant told her he still loved her but that he did not want to kick out Ms. Janson. Ms. Lovette said that, while she and Ms. Bowers stayed in the trailer, the victim and Ms. Lovette's daughter, A.B., stayed in the camper with Defendant and Ms. Janson.

Ms. Lovette said that, on the morning of April 1, 2019, she went to work but left early that afternoon for a doctor's appointment. She said that, after leaving the doctor's office, she had a voicemail on her phone from Ms. Bowers, saying, "Mom, this is very urgent. I need you home right now." Ms. Lovette testified that she went to the trailer and found the victim and Ms. Bowers inside. She testified that the victim "was sitting just with her head down, crying" and that Ms. Bowers was urging the victim to tell her what had happened. Ms. Bowers told Ms. Lovette that they needed to leave immediately, but the victim would not speak and just continued to cry. Ms. Lovette testified, "Finally, I got a little frustrated, and I just kind of screamed and I raised my voice. And I said, 'What is going on? Tell me.' And that's when [Ms. Bowers] had told me, 'Mom, [Defendant] raped [the victim.]'"

Ms. Lovette said that she initially went to the camper and confronted Defendant about the allegation, but he denied it. Ms. Lovette then left with her daughters and took the victim to the hospital. Ms. Lovette recalled that, at the hospital, a rape kit was conducted on the victim. Ms. Lovette said that she spoke to an officer at the hospital and

that she and the victim were interviewed the following day at the Children's Advocacy Center.

Ms. Lovette stated that, after leaving the hospital, the victim told Ms. Lovette that her vagina hurt and that "it was painful." Ms. Lovette said that, prior to the incident, the victim was a virgin, was not sexually active, and never had a boyfriend. She said that the victim had begun menstruating and that the victim had her period the week before April 1, 2019; Ms. Lovette explained that she knew this because she provided the victim "all her female products."

Ms. Lovette testified that the victim's behavior changed dramatically following the incident. She explained, "[The victim] just went from being a very outgoing kid, to now, most days she doesn't want to get out of her bed. We started counseling immediately. . . . But she suffers from severe anxiety, and she's had two stays in Woodridge for suicide attempts." She further stated that the victim had developed a "cutting addiction[.]"

On cross-examination, Ms. Lovette acknowledged that, prior to the incident, the victim missed school often but explained that it was "because [the victim] had a lot of health issues." She agreed that the victim was allergic to bee stings and that the victim was at risk of anaphylactic shock if stung. Ms. Lovette said that she had never previously given the victim Benadryl for a bee sting; she said that she had always used an epinephrine pen and then taken her to the hospital. Ms. Lovette continued:

> It was actually [Defendant] that had told me, "I'm not really sure whether she had been stung by a bee or not, but I think it's okay. It looks okay and she seems to be reacting okay. I think we'll be okay if we just give her some Benadryl."

Dr. Clifford Williamson testified that he was working as an emergency room physician at Sycamore Shoals Hospital on April 1, 2019. Dr. Williamson explained that, when his shift began at 6:00 p.m., he learned that the victim had come to the hospital earlier that day reporting that she had been sexually assaulted. Specifically, the victim reported she had been "penetrated vaginally" by her biological father's "penis and fingers." Dr. Williamson testified:

> At the time that I took over the care, we were awaiting a rape kit to come from law enforcement. As soon as the kit was provided, I went in, introduced myself to [the victim and] explained what would be necessary, what we were going to do step by step.

I had a nurse accompanying me as a witness and help[ing] me in collecting samples. We were able to then follow the instructions of the rape kit, obtain the evidence required, obtained swabs, place it in the appropriate envelopes as marked, and then we returned that kit to . . . law enforcement.

Dr. Williamson explained that, as part of the rape kit, he took two vaginal swabs from inside the victim's vagina, conducted a "visual examination," and collected the victim's underwear. Dr. Williamson said that, during his visual examination, he saw no signs of trauma; he observed no swelling, tearing, or bruising to the victim's labia. Dr. Williamson testified that he prescribed the victim antibiotics and the "morning-after pill" because there was a "concern for conception[.]" He stated that a review of the victim's medical records showed that, when she arrived at the emergency room, the victim was asked the date of her last menstrual period and that "it was noted to be 3/25/2019."

Jodie Soto testified that, on April 1, 2019, she was working as a registered nurse at Sycamore Shoals Hospital in the emergency room. Ms. Soto said that she was in the room with Dr. Williamson while he performed the rape kit and that, afterward, she provided the victim with "prophylactic medications." Ms. Soto described the victim as "very scared."

Sergeant Tracie Pierson with the Carter County Sheriff's Office (CCSO) testified that she responded to the emergency room at Sycamore Shoals Hospital to speak to the victim. Sergeant Pierson stated that she first met with Ms. Lovette, who reported that the victim had been raped by Defendant. Sergeant Pierson also took a statement from Ms. Bowers. The following exchange then occurred:

Q. What did you observe about [the victim] when you spoke with her?

A. She was in the exam bed, and she was covered up, kind of like in the fetal position.

Q. Okay. How was -- what did you observe about her demeanor and the way she was acting?

A. She was very scared, frightened. She wouldn't make eye contact with me. [Ms. Lovette] said that the reason why they requested the female officer is that she just didn't feel comfortable with a male.

Sergeant Pierson testified that she stepped out of the room while Dr. Williamson performed the rape kit; she then collected the completed rape kit and the victim's clothing, all of which she placed in the evidence locker at the sheriff's office.

Investigator Isaiah Grindstaff of the CCSO testified that, in April 2019, he worked as an evidence custodian for the sheriff's office. Investigator Grindstaff stated that the following pieces of evidence were obtained as part of the investigation into the allegations against Defendant:

> Item Number 1 being underwear taken at hospital from [the victim]; Item Number 2 being pants taken at hospital from [the victim]; Item Number 3 being the bra taken at hospital from [the victim]; Item Number 4 being a shirt taken at the hospital from [the victim]; Item Number 5 being the TBI sexual assault kit; Item Number 6 being a pink sheet that was found in the master bedroom; Item Number 7 shows a pink sheet that was found in the living room; Item Number 8, Astroglide lube; and Item Number 9, four buccal swabs taken from [Defendant].

Investigator Grindstaff explained that of the evidence collected, Items 1-6 and Item 9 were sent to the Tennessee Bureau of Investigation (TBI) Crime Laboratory for testing on April 11, 2019. He stated that, after the testing was completed, he picked up the evidence from the lab and returned the items to the CCSO evidence room. He said that the only individuals with access to the evidence room were evidence custodians employed by the CCSO.

Sergeant William Staschak of the CCSO testified that, on April 2, 2019, he assisted in the execution of a search warrant at Defendant's property on Whitehead Hollow Road, which consisted of a trailer and a "small camper above the [trailer]." Sergeant Staschak said that he arrived around 9:00 or 9:30 p.m. and ensured the scene was safe before the search. He said that, when he knocked on the door of the camper, Defendant answered but then "attempted to shut the door." Sergeant Staschak prevented Defendant from closing the door and requested that Defendant step outside so that investigators could search the camper.

CCSO Investigator Jenna Markland testified that she was the Special Victims Investigator for the sheriff's office and that she handled "mostly rape cases, child cases, elder abuse, missing juveniles, things of that nature." Investigator Markland stated that she was assigned to investigate the victim's rape report and that she first called the Children's Advocacy Center and scheduled an interview for the victim, which was conducted on April 2, 2019. Investigator Markland explained that, after the interview, she obtained a search warrant for Defendant's camper and that she assisted in the search.

Investigator Markland testified that, as part of the search, she was looking for items described by the victim during her interview, including "pink bedsheets" and "a bottle of Astroglide lube." She explained that the victim said that Defendant used the bottle of

Astroglide lubrication during the sexual assault and that the bottle was "hanging in either a pair of pants or in a jacket beside the bed, and it was . . . in a pocket."

Investigator Markland said that she searched the camper and logged the items of evidence. Investigator Markland collected a pink bedsheet that was inside the bedroom as described by the victim. She testified that she also located the Astroglide lubrication "just like [the victim] described, where she said the Astroglide lube was going to be located in the pants pocket."

Investigator Markland stated that, after the search was completed, Defendant agreed to come to the sheriff's office for an interview. Investigator Markland sat in on the interview, which was conducted by CCSO Captain Mike Little. She said that the interview lasted approximately three hours and that Defendant was "very solemn and . . . did not speak very much." She agreed that Defendant consistently denied having any sexual contact with the victim.

Investigator Markland identified a photograph of the "bloody underwear" that was collected from the victim at the hospital. She testified that the amount of blood on the underwear was surprising because the victim was not menstruating at the time of the incident. Investigator Markland acknowledged, however, that the underwear had not been tested so she could not be sure that the "reddish-brown stain" was blood. Nevertheless, Investigator Markland testified that, in her seven years as an investigator, she had seen dried blood hundreds of times and that the reddish-brown stain in the victim's underwear appeared to her to be dried blood. She said that she and Captain Little examined the pink bedsheet found in the bedroom with an alternative light source and found the presence of "[b]odily fluids" on the sheet.

Captain Mike Little of the CCSO testified that he interviewed Defendant following the execution of the search warrant. Captain Little said that the interview occurred at the sheriff's office and that it was video recorded. Regarding the night of March 31, 2019, Defendant told Captain Little that he had given the victim a Benadryl tablet because of a bee sting she had received "a couple days prior." Defendant said that Ms. Janson was on a set of bunk beds at the rear of the camper, either on her cell phone or a computer. Defendant said that he stayed up all night long playing a video game with Ms. Bowers in the common area of the camper. Defendant stated that, while playing the video game, he was sitting on a bed with the victim, who was "kind of squirming against his back." Defendant explained that, between 1:00 a.m. and 2:00 a.m., he decided to move the victim to the small bedroom at the front of the camper in order to have more room to play the video game. Defendant stated that the victim was "groggy" and that he "helped walk her to this bedroom" and then "laid her down in the bed." He said that, between 2:30 a.m. and

4:00 a.m., he returned to the bedroom four times to check on the victim. Defendant said that, on one occasion, he was in the bedroom checking on her for twenty minutes.

Defendant told Captain Little that, the following morning, he woke up A.B. around 5:00 a.m. so that she could get ready for school. He stated that he tried to wake up the victim for school around 6:00 a.m., but the victim said she was sick and felt nauseous and asked him if she could stay home, to which Defendant agreed. Defendant said that he fell asleep between 7:00 a.m. and 9:00 a.m. and that Ms. Janson, Ms. Bowers, and the victim were still inside the camper. Defendant said that he woke up around noon and that the victim woke up between 2:00 p.m. and 3:00 p.m. He said that, when the victim woke up, she left the camper and went to the trailer. He said that, around 4:00 p.m., Ms. Lovette came to the trailer "very upset" because of the victim's allegations against him. Defendant denied the allegations and offered to provide investigators with a DNA sample. Captain Little stated that, at the conclusion of the interview, Defendant's DNA was collected through buccal swabs.

The victim testified that she was thirteen years old in March 2019, and that Defendant was her biological father. She said that she had been living with Defendant and Ms. Janson in Defendant's camper for a few months leading up to March 31, 2019, and that her mother and three sisters lived in a trailer next to the camper. She stated that she normally slept on a "couch bed" in the camper. The victim testified that, on the night of March 31, 2019, she ate dinner at the trailer with her mother and that she returned to Defendant's camper with two of her sisters between 7:00 p.m. and 8:00 p.m. She said that her younger sister, A.B., fell asleep in the camper so she decided to go to sleep too. She said that she was watching anime on a computer screen when she fell asleep.

The victim testified that she had been stung by a wasp on March 31, 2019. She explained that she had been stung three times previously and that she had been given a shot of epinephrine quickly thereafter to control her allergic reaction. She said that she did not have a strong reaction to the wasp sting on March 31, explaining that the site was "just itchy" and that she took Benadryl to treat it. She said that she took one Benadryl from her mother earlier in the day and that Defendant then gave her another pill that he said was Benadryl, which she took. The victim said that, after falling asleep watching anime, she woke up in the bedroom of the camper. The victim testified that Defendant was on top of her and that he was "pouring a slick-like substance on [her] lower region." She said that Defendant pulled the lubrication out of a pocket of a jacket that he was wearing. The victim recalled that her pants and underwear had been pulled down and that, after Defendant applied the slick substance to her, Defendant "got beside of [her] and . . . proceeded to penetrate [her]." She testified that Defendant used his "hands" and his "d**k" to penetrate her. The victim said that Defendant told her, "If you're awake, open your eyes." She explained, however, that she was scared so she kept her eyes closed and pretended to be

- 8 -

asleep. The victim explained that Defendant's penetrating her caused her pain; she said that she pretended to be asleep because of "[h]ow big he was" and because "he could kill [her]." The victim said that she had not been sexually active before that night.

The victim stated that she woke up around 6:30 a.m. on April 1, 2019, but she did not go to school that day. She went to the trailer, where she saw Ms. Bowers. The victim testified that she was crying but could not tell her sister what happened; instead, the victim said she was sick and was not going to school. She said that she did not know what else to do, so she went back to the camper and went to sleep. The victim testified that she saw Defendant at the camper but that they did not speak.

The victim continued, "I woke up. And I thought, I can't do this to my sisters, I'm not going to make them go through it. So I went over to the trailer, and I woke . . . my oldest sister, [Ms. Bowers], and I had told her what happened." Ms. Bowers immediately texted their mother and told her to come home. The victim testified, "I couldn't bring myself to look my mom in the eyes and tell her[,]" so Ms. Bowers told their mother what Defendant had done.

The victim testified that Ms. Lovette took her to the hospital, where she was able to tell the doctors what happened to her. She recalled being examined by Dr. Williamson and that he completed a rape kit. The victim stated that she had not been menstruating at the time of the assault. She testified that she changed her underwear everyday but that she did not change them before going to the hospital. She said that she noticed blood in her underwear when she got to the hospital.

Special Agent Leigh Ann Corbitt testified that she worked at the TBI crime lab in Knoxville as a forensic technician supervisor. She said that she received evidence from Investigator Grindstaff on April 11, 2019, including four sealed brown paper bags and one sealed sexual assault kit. Agent Corbitt stated that the evidence consisted of underwear, pants, a bra, a shirt, a sexual assault kit, a bedsheet, and buccal swabs from Defendant. She said that she placed the items of evidence in the lab's secure evidence vault until they were tested. She explained that the evidence was sealed at all times, unless being analyzed, and that there was no possibility of it being "switched, cross contaminated, or otherwise mixed up with any other evidence sent to the lab[.]"

Special Agent Marla Newport testified that she worked as a forensic scientist assigned to the forensic biology unit at the TBI crime lab in Knoxville, and she was stipulated to be an expert in biology and DNA testing. Agent Newport said that she tested the items of evidence collected in Defendant's case and that she generated a report of her findings. She said that, of the items of evidence submitted, she tested the vaginal swabs from the victim, the victim's buccal standard, and Defendant's buccal standard. She said

that that her microscopic examination of the victim's vaginal swabs confirmed the presence of spermatozoa and that there was "quite a bit of a sample of male DNA" on the victim's vaginal swabs. Agent Newport stated that her testing showed that the male DNA matched that of Defendant.

When asked why she did not test all the items of evidence, Agent Newport explained:

> . . . . [W]e work a sexual assault case by finding the most intimate item first, and basically working from the inside out.

> So since vaginal swabs were submitted, I started there, and they were positive for the presence of sperm. Once a source has been identified, then I don't have to work any of the other evidence.

On cross-examination, the following exchange occurred:

> Q. Okay. . . . Tell the ladies and gentlemen of the [j]ury what an epithelial cell is.

> A. An epithelial cell is basically a skin cell.

> Q. Okay. And did you find the existence of epithelial cells in the sample . . . of vaginal secretion?

> A. I did, yes.

> Q. Okay. And were you able to determine whether those epithelial cells contained the DNA of . . . Defendant?

> A. The epithelial portion of this kit was consistent with [the victim.]

> Q. So are you saying that you excluded any epithelial cells of . . . Defendant from that sample?

> A. Yes.

Defendant testified that he was thirty-nine years old and that, in April 2019, he worked as a licensed practical nurse at a nursing home. Defendant said that he was the victim's biological father but that he did not have a relationship with her until she contacted him through Facebook in December 2018.

According to Defendant, Ms. Lovette told him that the victim was having trouble in school and "with people picking on her[,]" and Ms. Lovette said that she thought it might help the victim to have Defendant in the victim's life. Defendant said that he had concerns about where the victim was living. He said that the victim told him that "the guy that [they were] living with didn't have any food . . . and that he would turn the internet off on her, and that she was uncomfortable around him." Defendant further stated that Ms. Lovette told him that the man had been watching pornography around the victim. Defendant said that he offered to let Ms. Lovette and her children move into the trailer beside his camper if they would "fix up" the trailer.

Defendant said that, on March 30, 2019, he overheard the victim and her sister planning to sneak out of the camper to meet someone and that, consequently, he took the victim's phone away. He agreed that the victim was stung by a bee on either March 30 or 31; he said that he gave the victim Benadryl at the dosage listed on the package for her weight. He said that he gave her a dose of Benadryl "around dusk" because her foot was swollen, and she was "not putting pressure on the foot." Defendant stated that, after taking the Benadryl, the victim did not appear drowsy, sleepy, or mentally impaired.

Defendant testified that, on the evening of March 31, 2019, Ms. Lovette "cornered" him in the trailer and asked about the status of their relationship. Defendant explained that Ms. Lovette wanted to "get . . . back together" with him but that he told Ms. Lovette he "would not just kick [his girlfriend] to the curb[.]" He stated that Ms. Lovette was jealous and upset that he would not break up with Ms. Janson.

Defendant said that, around midnight, he was inside the camper playing a video game with Ms. Bowers. He said that the victim and A.B. were lying behind him on the foldout couch where he was sitting and that they were "kicking at each other" because there was not a lot of room. Defendant said that he "had [the victim] get up to make more room, because she was saying she was hot" and that he "had her get up and go to the other room because [it was] cooler in there[.]" He testified:

> [S]he hopped up and was hopping on one foot so I held my arm out for her to hang onto as she went to the bedroom. And I helped her sit down on the bed, just by letting her hold on to my arm, and I left the room.

Defendant testified that, when he checked on the victim thereafter, he was in the bedroom with her for fifteen minutes "at the most." He explained, "It takes a few minutes to take people's pulse and blood pressure, ask them if they're okay. Look for swelling around their face." He said that he was worried the victim was going to go into anaphylactic shock.

Defendant described the bed on which the victim was sleeping as a twin-sized mattress on top of a wooden queen-sized bedframe. He stated that he and Ms. Janson had numerous sexual encounters on the bed and on the same pink bedsheet. When asked what items in the bedroom would have his ejaculate on them, Defendant testified, "There was a keychain-sized vibrator. It had the keychain thing on it, took watch batteries. It was in the same pocket that the Astroglide lube was in. The sheet. There was a washcloth beside the bed." Defendant said that the washcloth beside the bed may have still been wet because he and Ms. Janson had sexual intercourse the previous day.

Defendant denied the victim's allegation that he raped her, stating:

I was in a camper with five other people. I think five. Eight feet away, about eight feet away. And -- someone who is a virgin, I would assume, would make some kind of noise or some kind of cry for help to somebody when -- if someone had a large penis, forcing it inside of them. I would think that they would say something or make some kind of noise or wiggle the bed or do something.

. . . .

I was concerned that she was going to die or I would not have checked on her as often as I did, and I felt like it was my job to check on her. I opened up my home to these people, because they had nowhere else to go, and that's why I'm sitting in court today.

Defendant testified that he woke up the victim and A.B. the following morning. He said that the victim began getting ready but that, about thirty minutes later, she "had tears in her eyes and was begging [Defendant] to let her stay out of school, said her stomach was hurting." Defendant said that because of the bee sting and because the victim appeared to be sincere, he agreed that she could miss school. Defendant said that the victim returned to the camper's bedroom and went back to sleep. He stated that he left for an appointment later that afternoon and that, when he returned, Ms. Lovette came over and began screaming at him and threatening to kill him. He said that Ms. Lovette accused him of raping the victim and told him to stay inside the camper until she and her daughters left the property. Defendant testified that he told Ms. Lovette that he did not do anything to the victim but that he stayed inside the camper as Ms. Lovette requested and did not see Ms. Lovette again for several days. Defendant said that Ms. Lovette later contacted him through Facebook Messenger and told him that she "had finally calmed down," that she was not afraid of him, and that she wanted to come and get some of her things from the trailer.

Defendant testified that, when investigators arrived at the camper with the search warrant, he agreed to go to the sheriff's office for an interview. He explained that, during the four-hour interview, he denied the victim's allegations and maintained his innocence. He testified that his ejaculate was in multiple places in the bedroom and that "it could have gotten on [the victim's] hands from the bedsheet and been easily transferred." Defendant further testified that his penis was "larger than average . . . over 7 inches long, about 6 1/2 inches around" and stated that "it would probably cause noticeable damage if [he] tried to have sex with a virgin."

On cross-examination, Defendant claimed that, although he signed the victim's birth certificate as her father, Ms. Lovette had told him that he was not the victim's father, and he had believed her. He agreed that he did not have any relationship with the victim until December 2018 and that, between Christmas 2018 and April 2019, he attempted to cultivate a relationship with her. He said that he picked her up from school and took her places like the mall and the skating rink, bought her a smart phone, allowed her to ride his four-wheeler on the weekends, and looked into buying her a small dirt bike. Defendant agreed that, in reuniting with the victim, he had also wanted to rekindle his relationship with Ms. Lovette. He acknowledged that, after moving Ms. Lovette into the trailer on his property, he and Ms. Lovette began a sexual relationship outside the knowledge of Ms. Janson.

Defendant asserted that the bee sting occurred on March 31; he said that he did not know whether Ms. Lovette had already given the victim Benadryl that day. Defendant agreed that one possible side effect of Benadryl was that it caused drowsiness. When asked if he had given the victim a second dose of Benadryl after Ms. Lovette had given her a dose, Defendant responded that Ms. Lovette never mentioned to him that she had given the victim Benadryl.

Defendant testified that, after assisting the victim into the bedroom in the camper, he returned to the bedroom to check on her three times within the first half hour. He said, "And then just kind of tapered off how often I was checking on her, because I didn't see [the swelling to her foot] getting any worse." Defendant acknowledged that he played anime cartoons from his cell phone while inside the bedroom with the victim. He stated that, when he took the victim to the bedroom, she was wearing a shirt and pants.

Defendant said that he did not dispute that it was his sperm found on the swab from inside the victim's vaginal cavity; however, he denied that the sperm was inside the victim because he put his penis into her vagina and ejaculated. Defendant described his theory of how his sperm was found inside the victim's vaginal cavity, as follows:

Well, I think that the dried spermatozoa with no tails was transferred by her hands, her wet hands to her vagina, or it could have been transferred from the keychain vibrator, or from the lube that she claims that I used on her. She had access to it.

Or, it could have been transferred from the washcloth that was laying beside of the bed that had spermatozoa on it, or she could have sat in wet spermatozoa and it seeped through her panties, because they're cloth[.]

During the trial, the court provided the State and defense a copy of "the latest draft of the [jury] instructions" and requested that the parties review the proposed instructions. The following day, the court asked the parties if there were any objections to the instructions, and none were raised. Before instructing the jury, the trial court questioned defense counsel about the instructions, asking whether he had had "a chance to glance over the jury instructions[.]" Defense counsel responded, "Well, we've done more than glance over them, yeah. We're -- we're satisfied that everything is there." At the conclusion of proof, the trial court again asked if there was "[a]nything to take up from the State or [d]efense on jury instructions[,]" and defense counsel indicated that Defendant was satisfied with the proposed instructions.

After the State's initial closing argument, the following exchange occurred:

THE COURT: Does the [d]efense wish to make a closing statement?

[DEFENSE COUNSEL]: Your Honor, we are going to rely upon the jury instructions and waive argument.

THE COURT: All right. No argument?

[DEFENSE COUNSEL]: No argument.

Following deliberations, the jury found Defendant guilty as charged. At a subsequent hearing, the trial court sentenced Defendant to twenty years for aggravated rape in Count 1; twenty years for aggravated rape in Count 2; five years for incest in Count 3; and five years for sexual battery by an authority figure in Count 4. The court ordered Counts 2 and 3 to run concurrently with Count 1, and it ordered Count 4 to run consecutively to all other counts, for a total effective sentence of twenty-five years' incarceration.

- 14 -

Defendant filed a timely motion for new trial and amended motion for new trial. Following a hearing, the trial court denied Defendant's request for a new trial in a written order. This timely appeal follows.

## II. Analysis

### A. Sufficiency of the Evidence

Defendant challenges the sufficiency of the evidence as it relates to his convictions for two counts of aggravated rape and one count of sexual battery by an authority figure. Defendant asserts that there was "no proof upon which the rational trier of fact could find that both [his] hands and penis or which of the two singularly caused bodily injury" to the victim and that, as such, the evidence was insufficient to support convictions for two separate counts of aggravated rape. Defendant further asserts that the jury did not hear proof of the element of force with regards to the two counts of aggravated rape. Finally, Defendant maintains that it is impossible for this court "to determine which facts the jury resolved in favor of the [S]tate, whether those facts were resolved unanimously, and whether the jury returned the verdicts of guilty based upon the elements provided in the presentments or those additionally provided in the jury instructions" for aggravated rape and sexual battery by an authority figure. The State responds that the evidence was sufficient to support Defendant's convictions.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and the weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

As relevant here, aggravated rape is the "unlawful sexual penetration of a victim by the defendant" where "the defendant causes bodily injury to the victim." Tenn. Code Ann. § 39-13-502(a)(2) (2019). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" Tenn. Code Ann. § 39-13-501(7) (2019). "Bodily injury" includes "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" Tenn. Code Ann. § 39-11-106(a)(2) (2019).

Sexual battery by an authority figure, as charged in this case, "is unlawful sexual contact with a victim by the defendant or the defendant by a victim" where "[t]he victim was, at the time of the offense, thirteen (13) years of age or older but less then eighteen (18) years of age," and "[t]he defendant had, at the time of the offense, parental or custodial authority over the victim and used the authority to accomplish the sexual contact." Tenn. Code Ann. § 39-13-527(a) (2019).

In this case, the victim testified in graphic detail about the circumstances of the sexual contact constituting the two counts of aggravated rape. At the time of the offenses, the victim was thirteen years old, a virgin, and sexually inexperienced; she said that she awoke in the bedroom of the camper to find her pants and underwear pulled down, and Defendant on top of her pouring a "slick" substance onto her vagina. The victim said that Defendant penetrated her with his hands and his penis. Hours later, the victim reported the incident to her sister and mother, both of whom knew something was wrong with the victim. The victim was taken to the hospital for examination and found to still have sperm in her vaginal cavity. Swabs from her vaginal cavity were collected as part of a rape kit and sent to the TBI crime lab for analysis, which determined that the DNA from the sperm inside the vaginal cavity matched Defendant's DNA.

Moreover, the State introduced evidence that the victim suffered bodily injury when Defendant penetrated her with his fingers and penis. She clearly testified that Defendant's penetrating her vagina caused her pain. That the victim described the penetration as painful suffices for bodily injury. Tenn. Code Ann. § 39-11-106(a)(2). Additionally, the State presented evidence that there was blood in the victim's underwear after Defendant's assault and that the victim was not menstruating at the time. The presence of blood in her underwear is evidence of further injury caused by Defendant. *See id.* Although the victim could not ascribe the cause of the pain and bleeding specifically to penile versus digital penetration, the jury could reasonably infer that both the penetration by Defendant's penis and penetration by his fingers were painful and caused bleeding. Once again, the victim was a thirteen-year-old girl and a virgin with no sexual experience while Defendant was an adult man who was much larger and had, as Defendant described, a "larger than

- 16 -

average" penis. Viewing the evidence in the light most favorable to the State, we conclude that the evidence was sufficient to support the jury's finding that Defendant was guilty of two counts of aggravated rape.

Although Defendant contends that the State failed to put on sufficient proof of force to sustain his aggravated rape convictions, force is not an element of aggravated rape by bodily injury. *See* Tenn. Code Ann. § 39-13-502(a)(2) (2019). While the language of the two counts of aggravated rape in the presentment contained the phrase "by use of force[,]" in addition to alleging that Defendant caused bodily injury, this does not alter our sufficiency analysis for this charge. "Generally, unless the matters alleged in the indictment are essential elements of the crime, they may be disregarded in analyzing the sufficiency of the convicting evidence." *State v. March*, 293 S.W.3d 576, 589 (Tenn. Crim. App. 2008) (noting that the allegation of two aggravating circumstances in an indictment did not require proof of both to establish the offense); *see also Church v. State*, 333 S.W.2d 799, 809 (Tenn. 1960) (stating that, unless the matters mentioned in the indictment are essential elements of the crime, they may be disregarded for purposes of sufficiency analysis).

Defendant also suggests that errors in the trial court's jury instructions on aggravated rape and sexual battery by an authority figure prevent this court from determining whether the evidence was sufficient to establish those crimes. As noted by the State, the Tennessee Supreme Court has found that the initial step in a sufficiency of the evidence review is examining the relevant statute to determine the elements of the offense, *see State v. Stephens*, 521 S.W.3d 718, 723-24 (Tenn. 2017), and this court has consistently followed the same approach. *See, e.g., March*, 293 S.W.3d at 589; *State v. Clark*, No. W2020-01036-CCA-R3-CD, 2022 WL 557736, at *13-14 (Tenn. Crim. App. Feb. 24, 2022), *perm. app. denied* (Tenn. June 9, 2022). This court has also noted that sufficiency of the evidence and jury instruction issues implicate different constitutional rights and must be addressed separately. *See State v. Perry*, No. E2019-00210-CCA-R3-CD, 2021 WL 1676403, at *18 (Tenn. Crim. App. Apr. 29, 2021), *no perm. app. filed*. Thus, we will address Defendant's claims regarding the jury instructions provided by the trial court in the next section of this opinion. Defendant's challenge to the sufficiency of the evidence is without merit, and he is not entitled to relief.

### B. Jury Instructions

Defendant contends that the trial court erred by instructing the jury on modes of committing aggravated rape and sexual battery by an authority figure that were not alleged in the presentment. He maintains that, in the absence of jury instructions that conformed to the language contained within the presentment, "the jury cannot be shown to have reached a unanimous verdict[.]" Defendant acknowledges that the issue was not raised

contemporaneously or in his motion for new trial, but he argues that he is entitled to relief as a matter of plain error. The State responds that the issue is waived and that the trial court did not commit plain error in instructing the jury.

A trial court in a criminal case is required to give "a complete charge of the law applicable to the facts of the case[.]" *State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). "[T]he defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge." *Id*. The right is constitutional in nature. *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990), *superseded by statute on other grounds as stated in State v. Reid*, 91 S.W.3d 247, 291 (Tenn. 2002).

As noted by the State, and conceded by Defendant, Defendant did not raise a contemporaneous objection to the jury instructions, and he failed to raise the issue in his motion for new trial. Thus, plenary review of this issue is waived. *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005) (concluding that any challenge to an erroneous jury charge is waived by failure to raise the issue in a motion for new trial); *see also* Tenn. R. App. P. 3(e); Tenn. R. App. P. 36(a); *State v. Allen*, 593 S.W.3d 145, 154 (Tenn. 2020) ("Generally, issues raised for the first time on appeal are waived.").

However, "when necessary to do substantial justice," this court may "consider an error that has affected the substantial rights of a party" even if the issue was waived. Tenn. R. App. P. 36(b). Such issues are reviewed under plain error analysis. *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010). Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *Adkisson*, 899 S.W.2d at 642. In order to be granted relief under plain error relief, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Adkisson*, 899 S.W.2d at 641-42; *see State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (formally adopting the *Adkisson* standard for plain error relief). When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283. Defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

As relevant to this appeal, Count 1 of the presentment reads:

The Grand Jurors for the State of Tennessee, upon their oaths, present that [Defendant], on or about the 1st day of April, 2019, in the State and

County aforesaid, did commit the offense of aggravated rape by unlawfully penetrating [the victim]; to wit: inserting his penis into her vagina, *by use of force and the victim did suffer bodily injury*; a class A felony, in violation of Section 39-13-502 of the Tennessee Code Annotated and against the peace and dignity of the State of Tennessee.

(Emphasis added). Count 2 of the presentment states:

And the Grand Jurors aforesaid, upon their oaths aforesaid, do further present that [Defendant], on or about the 1st day of April, 2019, in the State and County aforesaid, did unlawfully, commit the offense of aggravated rape by unlawfully penetrating [the victim]; to wit: inserting his fingers into her vagina, *by use of force and the victim did suffer bodily injury*; a class A felony, in violation of Section 39-13-502 of the Tennessee Code Annotated and against the peace and dignity of the State of Tennessee.

(Emphasis added). Count 4 of the presentment reads, as follows:

And the Grand Jurors aforesaid, upon their oaths aforesaid, do further present that [Defendant], on or about the 1st day of April, 2019, in the State and County aforesaid, did unlawfully engage in sexual contact with [the victim] who was 13 year[s] of age or older but less than 18 years of age and [Defendant] had at the time of offense, *parental authority over the victim*; a class C felony, in violation of Section 39-13-527 of the Tennessee Code Annotated, and against the peace and dignity of the State of Tennessee.

(Emphasis added).

In pertinent part, the trial court instructed the jury on aggravated rape in Counts 1 and 2, as follows:

Any person who commits the offense of aggravated rape is guilty of a crime.

For you to find the defendant guilty of this offense, the [S]tate must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) that the defendant had unlawful sexual penetration of the alleged victim or the alleged victim had unlawful sexual penetration of the defendant;

- 19 -

and

(2)(a) that force or coercion was used to accomplish the act, and the defendant was armed with a weapon or any article used or fashioned in a manner to lead the alleged victim reasonably to believe it to be a weapon;

or

(b) that the defendant caused bodily injury to the alleged victim;

*and*

*(c) that force or coercion was used to accomplish the act;*

and

(3) that the defendant acted either intentionally, knowingly or recklessly.
(Emphasis added).

In its instructions, the trial court defined "coercion" as the "threat of kidnapping, extortion, force or violence to be performed immediately or in the future or the use of parental, custodial or official authority over a child less than fifteen (15) years of age." Additionally, the court instructed that "force" meant "compulsion by the use of physical power or violence."

The court instructed the jury on the elements of sexual battery by an authority figure in Count 4, as follows:

Any person who commits the offense of sexual battery by an authority figure is guilty of a crime.

For you to find the defendant guilty of this offense, the [S]tate must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) that the defendant had intentional unlawful sexual contact with the alleged victim in which the defendant intentionally touched the alleged victim's intimate parts, or the clothing covering the immediate area of the alleged victim's intimate parts that the alleged victim had intentional unlawful sexual contact with the defendant in which the victim intentionally

touched the defendant's, or any other person's intimate parts, or the clothing covering the immediate area of the defendant's, or any other person's intimate parts;

and

(2) that the victim was thirteen (13) years of age or older but less than eighteen (18) years of age and the defendant acted intentionally, knowingly or recklessly with regard to the age of the alleged victim;

and

(3)(a) that the defendant was, at the time of the alleged unlawful sexual contact, in a position of trust, and intentionally, knowingly, or recklessly used such position of trust to accomplish the sexual contact;

or

(b) that the defendant had, at the time of the alleged unlawful sexual contact, disciplinary power over the victim by virtue of the defendant's legal status, and intentionally, knowingly, or recklessly used such power to accomplish the sexual contact;

or

(c) that the defendant had, at the time of the alleged unlawful sexual contact, parental or custodial authority over the victim and intentionally, knowingly, or recklessly used such authority to accomplish the sexual contact[.]

Defendant contends that he is entitled to plain error relief because the trial court's jury instructions for aggravated rape and sexual battery by an authority failed to conform to the charges contained within the presentment. He asserts that, by including all the different modes of committing aggravated rape and sexual battery by an authority figure, the jury instructions expanded the allegations against him and made it impossible to determine which elements the jury found were proven beyond a reasonable doubt. Defendant avers that consideration of the error is necessary to do substantial justice "by way of preserving the rule of law" and because he "did not receive a constitutionally fair trial."

The State responds that no substantial right of Defendant's was adversely affected and that substantial justice does not require consideration of the error because the proof and argument at trial readily demonstrate that the jury convicted Defendant based on the charged offenses.

Turning to the *Adkisson* factors, the record clearly establishes what occurred in the trial court. *Adkisson*, 899 S.W.2d at 641. Moreover, the record demonstrates that a clear and unequivocal rule of law was breached. *See id*.; *see also State v. Bowman*, 327 S.W.3d 69, 94 (Tenn. Crim. App. 2009) ("[W]hen a statute contains different ways to commit the offense it proscribes, the instruction given to the jury should be limited to the precise offense alleged in the charging instrument to the exclusion of the remaining theories.") (citing *State v. Mitchell*, No. 01C01-9209-CR-00295, 1993 WL 65844, at *3 (Tenn. Crim. App. Mar. 11, 1993)).

As to whether a substantial right of Defendant was adversely affected, we note that a criminal defendant has a right to a complete and accurate charge of the law. *See, e.g., State v. Howard*, 504 S.W.3d 260, 270 (Tenn. 2016); *Adkission*, 899 S.W.2d at 641-42. This right emanates from the right to a trial by jury guaranteed by the Sixth Amendment of the United States Constitution and Article I, section 6 of the Tennessee Constitution. *Howard*, 504 S.W.3d at 270. We conclude that because the instructions for aggravated rape and sexual battery by an authority figure given by the trial court were inaccurate, a substantial right of Defendant was adversely affected.

Although not entirely clear from the record, we note that Defendant may have waived the issue for tactical reasons. *See Adkisson*, 899 S.W.2d at 641. The trial court's instructions for aggravated rape by bodily injury required that the State not only prove that Defendant caused the victim to suffer bodily injury but also the additional, non-statutory element that Defendant used "force or coercion." This erroneous instruction would have benefited Defendant as it necessitated the State's proving a fact not required by statute in order to convict Defendant of aggravated rape. *See* Tenn. Code Ann. § 39-13-502(a)(2) (2019). Defendant was given multiple opportunities to object to the trial court's proposed instructions and did not do so, and then, instead of making a closing argument, defense counsel announced that Defendant was "going to rely upon the jury instructions and waive argument." Under these circumstances, we cannot conclude that Defendant did not waive the issue for tactical reasons.

Regarding the final *Adkisson* factor of whether "consideration of the error is necessary to do substantial justice," we note that the jury was instructed on the mode of committing aggravated rape alleged in the presentment (bodily injury) and on an additional mode not charged in the presentment—that Defendant used force or coercion and was armed with a weapon. *See* Tenn. Code Ann. § 39-13-502(a)(1) (2019). As determined

above, the evidence was sufficient to support Defendant's conviction of aggravated rape where Defendant caused bodily injury to the victim. In contrast, there was no evidence at trial regarding Defendant's use of a weapon during the offense; rather, the proof was focused on showing that the victim suffered an injury when Defendant raped her. Additionally, during its closing argument, the State asserted that the victim's testimony established both pain and a cut or abrasion, a clear argument for the bodily injury element of aggravated rape. The State made no argument that Defendant possessed a weapon during the incident. From this, it is clear that the jury convicted Defendant under the bodily injury mode of committing aggravated rape as alleged in the presentment and not on the mode of committing aggravated rape erroneously included in the jury instructions (use of force or coercion and armed with a weapon). Therefore, we cannot conclude "the error is so significant that it 'probably changed the outcome of the trial.'" *See Hatcher*, 310 S.W.3d at 808 (quoting *Smith*, 24 S.W.3d at 282-83); *State v. Marable*, No. W2022-01591-CCA-R3-CD, 2024 WL 418129, at *6-8 (Tenn. Crim. App. Feb. 5, 2024) (holding that defendant was not entitled to plain error relief where the jury was instructed on modes of the offense of aggravated kidnapping both charged and uncharged in the indictment), *perm. app. denied* (Tenn. June 21, 2024); *State v. Edwards*, No. E2019-02176-CCA-R3-CD, 2021 WL 2554217, at *17 (Tenn. Crim. App. Feb. 18, 2021) (holding that plain error relief was not required where jury was instructed on modes of the offense both charged and uncharged in the indictment and the evidence was sufficient to support the conviction as to the mode charged, and distinguishing cases in which only an uncharged mode of the offense was included in the jury instructions), *perm. app. denied* (Tenn. Nov. 17, 2021); *cf. State v. Smith*, No. W2019-01882-CCA-R3-CD, 2020 WL 4346798, at *7 (Tenn. Crim. App. July 28, 2020) (holding that plain error relief was necessary where the jury was not instructed on the mode of committing the offense charged in the indictment but was instructed on a separate mode which was not charged), *reh'g denied* (Aug. 17, 2020). *But see State v. Smith*, No. W2011-01630-CCA-R3-CD, 2013 WL 3702369, at *7-8 (Tenn. Crim. App. July 12, 2013) (granting plain error relief where the trial court included in the jury instructions modes of the offense both charged and uncharged in the indictment).

Defendant's plain error argument regarding the jury instruction for sexual battery by an authority figure is equally unavailing. Count 4 of the presentment only alleges the mode of committing sexual battery by an authority figure based upon parental authority. *See* Tenn. Code Ann. § 39-13-527(a)(3)(B). The trial court's instruction contained language concerning this mode of committing the offense as well as the mode centered around a position of trust or authority based on the defendant's legal status. *See id.* § 39-13-527(a)(3)(A). The evidence presented at trial with respect to this charge was focused on the fact that Defendant was the victim's biological father. The testimony did not speak to any particular position of trust or to any legal status of Defendant's. Moreover, the State's closing argument highlighted that Defendant was the victim's father, not that Defendant occupied a position of trust or that he had power over the victim due to legal

status. Given that the proof and argument at trial readily demonstrate that the jury convicted Defendant based on the mode of committing sexual battery by an authority figure charged in the presentment, substantial justice does not require consideration of the error. *See Adkisson*, 899 S.W.2d at 642.

Because Defendant has not established all five of the *Adkisson* factors, he is not entitled to plain error relief based upon the trial court's erroneous jury instructions.

### III. Conclusion

Based upon the foregoing, we affirm the judgments of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE